**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**DAWNA ALLEN,**

    **Plaintiff,**

**vs.**                       **CIVIL ACTION NO. 2:19-CV-00097**

**ANDREW SAUL,
COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered February 11, 2019 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 14, 17)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings to extent that the final decision be reversed (ECF No. 14), **DENY** Defendant's request to affirm the decision of the Commissioner (ECF No. 17); **REVERSE** the final decision of the Acting Commissioner; and **REMAND** this action back for further proceedings as stated *infra*.

## Procedural History

The Plaintiff, Dawna Allen (hereinafter referred to as "Claimant") protectively filed her applications for Titles II and XVI benefits on May 7, 2015 and August 5, 2016, respectively, alleging disability since July 1, 2009 due to numerous ailments: COPD, PTSD, depression, anemia, kidney problems, obesity, panic disorder, leaky heart valve, large abdominal hernia, spinal arthritis, "diverticulars" [*sic*], seizures, migraines, and a "bad ligament in right foot."[1] (Tr. at 385, 386) Her DIB claim was initially denied on July 7, 2015 (Tr. at 151-155) and again upon reconsideration on September 5, 2015. (Tr. at 157-159) Following Claimant's request for a hearing, an administrative hearing was held on April 6, 2017 before the Honorable Jerry Meade, Administrative Law Judge ("ALJ"). (Tr. at 47-75) Afterwards, the ALJ issued an unfavorable decision on October 17, 2017 (Tr. at 123-146); on February 8, 2018, the Appeals Council, following Claimant's request for review, vacated the ALJ's decision and remanded the matter back to the ALJ for further proceedings. (Tr. at 147-150)

Accordingly, the ALJ held another administrative hearing on June 6, 2018. (Tr. at 76-105) On July 12, 2018, the ALJ entered an unfavorable decision. (Tr. at 17-46) Claimant requested review of the decision (Tr. at 292-293); the ALJ's decision became the final decision of the Commissioner on December 11, 2018 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-7)

On February 8, 2019, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant

---

[1] In her Disability Report-Appeal, submitted on August 27, 2015, Claimant alleged that her conditions had worsened, specifically that "Vertebrae in spine is crushed. Neck pain is worse." (Tr. at 405) In a subsequent Disability Report-Appeal, submitted on October 15, 2015, Claimant stated that she had broken her tailbone, making it difficult to get up or down "from sitting or lying position" or "to sit very long" and that it hurt to walk. (Tr. at 414)

(hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 14), in response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 17) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 47 years old as of the alleged onset date and 56 years old at the time of ALJ Tilley's unfavorable decision; during the underlying proceedings she changed age categories from a "younger person" to a "person of advanced age". See 20 C.F.R. §§ 404.1563(c) and (e), 416.963(c) and (e). (Tr. at 82) Claimant has a high school education, and later obtained a certificate as a "med assistant" and last worked as a veterinary tech assistant. (Tr. at 83) She last worked in 2009 (Tr. at 310) because she "had sicknesses" including meningitis and seizures that she "had to quit" because she was missing so much work. (Tr. at 83-84)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from

a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture

of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to this subpart.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The

Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

### Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2014. (Tr. at 22, Finding No. 1) Under the first inquiry, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of July 1, 2009. (Id., Finding No. 2) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease; Tarlov cysts; sciatica; carpal tunnel syndrome ("CTS"), status-post release; status-post ventral hernia repair; chronic obstructive pulmonary disease ("COPD"); chronic interstitial lung disease; morbid obesity; major depressive disorder; and panic disorder. (Id., Finding No. 3) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 26, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform medium work with the following limitations:

> She can occasionally climb ladders, ropes, or scaffolds. She can frequently climb ramps and stairs. She can frequently balance, stoop, kneel, crouch, and crawl. She can frequently handle, finger, and feel with the dominant left hand. She must avoid concentrated exposure to extreme cold; vibrations; irritants such as fumes, odors,

6

dust, gases, and poorly ventilated areas; and hazards such as moving machinery and unprotected heights. The claimant can understand, remember, and carry out detailed and simple instructions. She can have only occasional changes in the work setting. She can occasionally interact with the public.

(Tr. at 28, Finding No. 5)

At step four, the ALJ found Claimant was unable to perform any past relevant work. (Tr. at 35, Finding No. 6) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Tr. at 35-36, Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from July 1, 2009 through the date of the decision. (Tr. at 37, Finding No. 11)

## Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the ALJ's errors below are multifaceted. For starters, the ALJ impermissibly excluded the results of a nerve conduction study of Claimant's lower extremities that indicated severe neurological impairment. (ECF No. 14 at 12-13) This study was ordered by Claimant's treating medical provider, Gregory Porter, MPAS, P.A.-C, who reported the findings at a follow-up appointment, changing Claimant's diagnosis from peripheral neuropathy to lumbago with sciatica. (Id. at 13) By excluding this objective medical evidence, the ALJ then proceeded to improperly discount the opinions provided by Timothy Guiden, a physical therapist, and Dora Hughes, an electrophysiologist, determining their opinions were unsupported by the record. (Id. at 15)

Claimant further argues that the ALJ failed to recognize the consistency of the medical record of evidence with her limitations. (Id. at 16-17) Significantly, Claimant's functional limitations necessitated her approval for 5.5 hours daily of Home Health Care Worker assistance

via West Virginia's Title 19 Medicaid Waiver program. (Id. at 17) Additionally, the ALJ substituted his own lay opinion to discredit Mr. Porter's diagnosis of neuropathy. (Id. at 18-19)

With regard to the ALJ's RFC assessment, Claimant contends that the hypothetical question posed to the vocational expert failed to fairly consider all of her impairments, and instead relies upon limitations without citation to the medical record. (Id. at 19-20) Claimant argues that the limitations noted by Mr. Guiden in his medical statement concerning Claimant's physical ability to do work related activities is the appropriate and fair assessment of her impairment and related impact on her ability to do any work. (Id. at 21)

Claimant asks this Court to reverse the Commissioner's final decision and direct an award for benefits, or alternatively, to remand this matter for another hearing before a different ALJ. (Id. at 22)

In response, the Commissioner argues that Claimant's medical records did not support a finding of a severe neurological impairment, and the ALJ explained why he found Claimant's neuropathy was not a medically determinable impairment. (ECF No. 17 at 11-14) Further, the ALJ found several other severe impairments at step two and proceeded to the next steps in the sequential evaluation process, therefore no error was committed. (Id.) The ALJ's determination is reasonable given the fact that Claimant's peripheral neuropathy was a one-time diagnosis, which was subsequently changed to sciatica in accordance with the unsigned nerve conduction study. (Id.)

Further, the ALJ appropriately weighed the opinions provided by Mr. Guiden and Ms. Hughes because substantial evidence did not support their extreme opinions; moreover, Mr. Guiden and Ms. Hughes are not acceptable medical sources whose opinions are entitled to controlling weight if the evidence supports same. (Id. at 14-15) The ALJ explained that their

opinions were inconsistent with the medical evidence and other evidence of record. (Id. at 15-16)

Finally, the ALJ's hypothetical to the vocational expert fairly set out all of Claimant's impairments, and is not required to include limitations in the hypothetical that are not supported by the record. (Id. at 17-18) Thus, the ALJ was not duty bound to adopt the limitations found by Mr. Guiden and Ms. Hughes in formulating a hypothetical question to the vocational expert. (Id. at 18)

The Commissioner asks this Court to affirm the final decision that Claimant was not disabled. (Id.)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Treatment Records Related to Neurological Impairment:

In August 2012, Claimant presented to Gregory Porter, P.A., her primary care provider, for various acute, unremarkable ailments, including complaints of left inner thigh redness, swelling and discomfort as well as a swollen right ear. (Tr. at 531, 767, 769) She reported that she "cleans homes" and "does swim." (Tr. at 532, 531) In December, she complained of leg pain and multiple joints bothering her. (Tr. at 760) Although her right knee was tender on examination, all other findings were normal. (Tr. at 762)

In 2013 and 2014, Claimant's examinations were unremarkable including full range of motion, no musculoskeletal tenderness, and no edema. (Tr. at 706, 707, 741, 751, 752, 757, 758, 759) She repeatedly denied any neurological symptoms. (Tr. at 706, 744, 747) Treatment notes

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

from March 2014 indicate she was "employed as a housecleaner." (Tr. at 706)

In January through April 2015, it was noted that Claimant repeatedly had a normal gait and unremarkable examinations. (Tr. at 635, 641, 658, 694, 731, 732, 735, 995, 996) During a follow-up appointment on March 24, 2015 for an iron infusion, she complained of weakness in her legs but otherwise reported she was doing "well." (Tr. at 635, 637)

In May, Claimant told Mr. Porter that her left leg went numb and was very painful (Tr. at 726), otherwise, she had a normal examination. (Tr. at 727, 728) She was assessed with peripheral neuropathy and iron deficiency anemia, and a nerve conduction study of her lower left extremity was ordered. (Tr. at 728) The unsigned nerve conduction study, performed on June 9, 2015, indicated the following findings:

> the left peroneal (ankle to EBD) CMAP amplitude, F-wave (mean) and F-wave (maximum) are outside normal limits.
> the left tibial (ankle to AH) DML and CMAP amplitude are outside normal limits.
> the left sural (calf to ankle) sensory response is absent.
> the right peroneal (ankle to EDB) CMAP amplitude is outside normal limits.

(Tr. at 929-933) Under the "Reference Statements" heading, the nerve conduction study results indicated: moderate left L5/S1 radiculopathy; moderate right L5/S1 radiculopathy; left tibial neuropathy at ankle; and moderate polyneuropathy. (Tr. at 930) At her follow-up appointment on June 30, 2015, Claimant complained to Mr. Porter of a burning sensation in her "left leg or foot." (Tr. at 920) A physical examination was normal. (Tr. at 921) Mr. Porter changed Claimant's diagnosis to lumbago with sciatica after reviewing the abnormal nerve conduction study "suggesting L4-L5 involvement an[d] sciatic pain into left leg." (Id.) Mr. Porter began injections/Kenalog at 80 mg and Gabapentin for pain at 100 mg three times daily. (Id.) Mr. Porter also ordered an MRI of her lumbar spine (Id.); Claimant underwent an MRI examination on August

29, 2015 which showed "mild" degenerative changes. (Tr. at 923)

In July, Claimant had a cough after apparently inhaling chemicals (Tr. at 915); she denied any edema or neurological symptoms and had a normal examination. (Tr. at 916, 917)

In August, Claimant complained of low back pain. (Tr. at 911) On examination, her lower back was tender, but no other abnormalities were noted. (Tr. at 913) She was instructed to take ibuprofen 600 mg three times daily and follow a weight loss diet. (Id.) She received an injection in her right hip. (Id.)

In October, Claimant complained of low back pain to Mr. Porter, and denied any neurological symptoms; she was in no acute distress and had a normal examination. (Tr. at 907-909, 946-947) In November, she presented to Darshan Dave, M.D., of the Neurology & Headache Clinic, PLLC, and reported daily lower back pain from mild to moderate severity that radiates to her hips and legs and that her "numbness/tingling comes and goes." (Tr. at 1219) Her neurological examination was normal including full strength in all extremities with no weakness noted and normal gait and coordination without the use of any assistive devices. (Tr. at 1220, 1221) Because her numbness and tingling, "paresthesia" was "uncontrolled on Neurontin 100 mg three times per day", Dr. Dave increased her dosage of Neurontin to 300 mg three times per day. (Tr. at 1220)

In February 2016, Claimant complained of pain in her left leg. (Tr. at 950) On examination, she was in no acute distress and no abnormalities were noted. (Tr. at 951-952) Another MRI of her lumbar spine was ordered. (Tr. at 952) The MRI was performed on March 21, 2016 and showed no high-grade central canal narrowing or herniated disc, and generally "mild" disc desiccation. (Tr. at 956)

In April, Claimant underwent a ventral hernia repair. (Tr. at 963) Upon examination at this

time, she was in no acute distress and moved all extremities without difficulty. (Tr. at 964)

On May 24, 2016, Claimant visited Matthew Walker, M.D., a neurologist, for her low back and left leg pain. (Tr. at 1057-1060, 1195-1198) It was noted that Claimant's "left leg pain travels in an L5 dermatomal pattern, traveling down the lateral aspect of her left thigh primarily not lower than her knee." (Tr. at 1196) Dr. Walker noted further that Claimant "states on rare occasion, it does travel into her foot but she does not differentiate any specific toes. She describes the leg symptoms as tingling, burning and shocking. She describes her low back pain as aching, throbbing, sharp, burning and constant." (Id.) Claimant told Dr. Walker that her symptoms were worse with walking and bending and sitting, but improved with rest. (Id.)

Upon examination, she had an antalgic gait, pain to palpation over her spine, and limited range of motion, her strength was 5/5 in all extremities, her sensation was intact except in her left thigh, she had a normal tone without atrophy, and her range of motion of the joints was intact. (Tr. at 1059, 1198) Her coordination was intact and straight leg raising was negative bilaterally. (Id.) She was in no acute distress and was "pleasant." (Tr. at 1059, 1197) When asked what treatment she had tried, Claimant stated she had only tried medication and it helped "some." (Tr. at 1196) She reported that "her primary care recommended physical therapy approximately one year ago but she felt that she would prefer to have the MRI before starting physical therapy" and that she recently underwent a ventral hernia repair and limited on her physical activities until this has healed. (Id.) Dr. Walker reviewed an MRI taken on March 21, 2016, which showed degenerative disc disease, but no significant disc bulge central canal stenosis or neural foraminal narrowing at any level. (Tr. at 1198) Based upon his examination, he diagnosed Claimant with degenerative disc disease of the lumbar spine. (Id.) Dr. Walker noted he "[did] not see any surgically remediable

pathology" and recommended "conservative treatment with physical therapy." (Tr. at 1059, 1198)

In July, Claimant returned to Mr. Porter to follow-up on her low back pain. (Tr. at 1017) She was in no acute distress and had an unremarkable examination, though she reported "[f]eeling poorly (malaise)." (Tr. at 1018) No neurological, musculoskeletal, or other abnormalities were noted except for her obesity; Claimant requested a referral for a second opinion. (Tr. at 1017)

In September, Claimant presented to Mr. Porter and had an unremarkable examination other than tenderness on her lumbar spine. (Tr. at 1023) She did not have any neurological complaints and no such abnormalities were noted. (Tr. at 1022) She requested a referral to "laser spine institute in [C]olumbus." (Tr. at 1021) About a week later, Claimant presented to Mohamed Kadoura, M.D. at the Charleston Nephrology, Hypertension and Transplant, PLLC for follow-up of anemia in no acute distress and had an unremarkable examination including normal gait. (Tr. at 999)

Claimant continued to have generally normal examinations in 2017 other than tenderness in her right shoulder on one occasion. (Tr. at 1154) She repeatedly denied any neurological or musculoskeletal symptoms and had a stable gait and station and no abnormalities. (Tr. at 1085, 1127-1129, 1175) An x-ray from May 2017 showed degenerative changes in the thoracic spine, which were "stable" compared to imaging from January 2017. (Tr. at 1139) In August, she reported to her treating psychiatrist, Lawrence B. Kelly, M.D., after having planned a funeral for a woman she considered her mother and the death of an uncle, Claimant reported she was "going to [the] beach this week on vacation." (Tr. at 1175)

In January 2018, Claimant denied any neurological symptoms. (Tr. at 1146) Upon examination, she was in no acute distress, and there were no neurological or musculoskeletal abnormalities noted. (Tr. at 1146, 1147) Treatment notes from the end of the month show she had

a stable gait and station and was "doing well." (Tr. at 1172)

In March, Claimant reported to Mr. Porter that she had worsened back pain, but stated a heating pad and Asper cream helped. (Tr. at 1185) She also reported neuropathy in her legs and feet. (Id.) On examination, she was in no acute distress and no musculoskeletal or neurological abnormalities were noted. (Tr. at 1187) Another MRI was ordered, she was prescribed Skelaxin 800 mg three times daily for muscle spasms, and she was instructed to pursue a weight loss diet. (Tr. at 1188) About two weeks later in March, Claimant presented to Dr. Kelly with a stable gait and station. (Tr. at 1217) An MRI of her lumbar spine from April 2018 showed "mild" degenerative changes. (Tr. at 1184)

Records Related to Other Physical Impairments:

Due to Claimant's complaints of pain and swelling in her left ankle despite no evidence of injury, in August 2013, Mr. Porter ordered an x-ray which indicated she had a large calcaneal spur. (Tr. at 825) In July 2014, an x-ray was taken of Claimant's right heel due to complaints of pain; calcaneal spurring at the both the insertion of the Achilles tendon and on the plantar aspect was noted and no evidence of acute fracture. (Tr. at 814) In August 2014, Claimant returned to Mr. Porter and reported that her right foot "is no better"; Mr. Porter prescribed her a Medrol (Pak) and Norco for her calcaneal spur and referred her to podiatry. (Tr. at 745)

In January 2015, Mr. Porter referred Claimant to the Charleston Nephrology, Hypertension and Transplant, PLLC for evaluation of iron deficiency anemia. (Tr. at 994-996) Claimant was diagnosed with chronic, intestinal malabsorption by nephrologists Abdul R. Zanabili, M.D, Amir EL Toukhy, M.D., and Mohamed Kadoura, M.D.; with a ferritin level of five and a TSAT at 12%, Claimant's chronic iron deficiency anemia necessitated periodic iron infusion therapy. (Tr. at 633,

650, 992-1000) After four iron infusions, a treatment note from March 2015 indicated that Claimant was "positive for fatigue." (Tr. at 635)

APS Healthcare:

On June 6, 2016, the West Virginia Medicaid Aged and Disabled Waiver program approved Claimant for 5.5 hours per day of Home Health Care Worker assistance. (Tr. at 976) The initial assessment, provided by Mary Casto, RN with APS Healthcare, determined that "[i]n an emergency applicant would require physical assistance to vacate due to her ambulatory status." (Tr. at 984) Nurse Casto noted that she "observed applicant transfer from couch to standing position with a 1 person assist. Applicant reports she requires assistance to transfer on and off a regular toilet at times, reports she is presently sleeping on the couch, requires assistance on and off of the couch at this time." (Id.) She also "observed applicant walk with a 1 person assist, no assistive device used. Applicant denies any assistive devices for walking at this time, reports she holds on to furniture and walls in her home. . . [a]pplicant reports she falls 4-5 x monthly, reports her last fall was last week, no injury reported." (Id.) Nurse Casto noted further that she observed Claimant's gait was unsteady. (Tr. at 989)

The report also details Claimant's need for assistance in and out of the shower, assistance washing her back, hair and lower extremities; requires assistance with shoes and socks, putting on tops, pants and panties; requires grooming assistance; incontinence of bladder daily and wearing pads 24 hours per day. (Id.)

Opinion Evidence:

On March 20, 2017, Tim Guiden, a physical therapist, and Dara Hughes, an exercise physiologist, completed a Medical Source Statement of Ability to Do Work-Related Activities

(Physical) and opined that Claimant could: lift and/or carry less than ten pounds; stand and/or walk for less than two hours in an 8-hour workday; sit for less than six hours in an 8-hour workday; and push/pull with the lower extremities on a "limited" basis. (Tr. at 1121-1122) Mr. Guiden and Ms. Hughes further opined that the basis for these limitations is due to Claimant's "[l]ack of endurance (SOB & exertion observed), increased pain." (Tr. at 1122) They noted that Claimant reported that she spent most of the day laying down, and "[w]hile sitting beyond a few minutes, was constantly positioning. Observed [and] verbalized pain [and] difficulty limited performance." (Id.) Mr. Guiden and Ms. Hughes noted Claimant had difficulty walking which "prevented push/pull testing." (Id.) They further noted that Claimant could occasionally climb stairs, but using handrails for support. (Id.) They also opined that Claimant could never balance, kneel, crouch, crawl, or stoop. (Id.) Their reasoning for these findings is due to Claimant's limited range of motion, endurance, stamina and difficulty with balance. (Id.)

Mr. Guiden and Ms. Hughes also determined that Claimant was limited in reaching in all directions, including overhead and in handling, gross manipulation. (Tr. at 1123) They opined that she could occasionally reach and handle, frequently finger, and constantly feel. (Id.) They noted that the reason for these limitations were due to Claimant's range of motion in lifting overhead only was limited, but with respect to handling, Claimant's grip testing indicated she was "nonfunctional as she did not reach 25# in either hand in any position." (Id.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she had back problems when she stopped working as a vet tech and that they have continued long afterwards. (Tr. at 84) She stated that she experiences pain every

day and described it as a stabbing and throbbing pain that starts at the top of her pants and goes down into her hips. (Tr. at 84-85) She used a heating pad all the time to try to reduce the pain, but she has burned her hips because of it. (Tr. at 85) She testified that she can't get any relief for her pain and lays on the couch 18 hours a day. (Id.)

Claimant also stated that she has nerve pain, which is located in her left leg, but has started in her right leg as well, and goes down to her knee. (Tr. at 86) She takes Gabapentin for her nerve pain, which helps, but doesn't completely get rid of it. (Id.) She testified that she uses the heating pad and cream every day for this pain. (Id.) Claimant stated that she has had this pain for about three or four years. (Tr. at 86-87) She also takes ibuprofen, but it makes her sick to her stomach. (Tr. at 87) She has tried physical therapy, too, but it did not resolve her condition. (Id.)

Claimant was to start pain management, but an infected gallbladder prevented her from starting this treatment. (Tr. at 88)

Claimant explained that she qualified for the West Virginia Age and Disability Waiver where a worker comes into her home five and a half hours a day. (Tr. at 89-90) Claimant says she will fix Claimant's meals, goes to the store for her, give her a shower, helps Claimant get dressed, and will take Claimant to her doctor's appointments by letting her out near the door so that Claimant doesn't have to walk. (Tr. at 90) The worker also cleans Claimant's house. (Id.)

Claimant testified that she had two hernia surgeries, and as a result, she is limited to lifting under ten pounds. (Tr. at 90, 94) She has also been anemic for about 12 years and received five iron infusions to bring her ferritin levels to normal; she said her anemia makes her sleepy and short of breath. (Tr. at 92-94) She uses a nebulizer twice a day, when she gets up and when she goes to bed, for her breathing issues. (Tr. at 95) She admitted to having smoked since she was 20 years

old and continue to smoke a pack and a half per day, though she testified she is going to try to quit. (Tr. at 96)

With respect to Claimant's spurs and arthritis in her feet, she testified that has swelling in her feet and legs for which she takes Lasix; she said this medication helps with the pain and swelling but not completely. (Tr. at 96-97) Claimant stated usually her feet will "give out" and she will fall to the side. (Tr. at 97)

Claimant testified that she had a left wrist carpal tunnel release, however, it did nothing for her. (Tr. at 98) She explained that she continues to have pain and numbness in her hand and that she drops things. (Tr. at 98-99)

Gina Baldwin, Vocational Expert ("VE") Testimony:

The ALJ asked the VE to assume a hypothetical individual of Claimant's age, education and work experience who can perform medium work; can occasionally climb ladders, ropes and scaffolds; can frequently climb ramps and stairs; can frequently balance, stoop, kneel, crouch and crawl; can frequently handle, finger and feel with the dominant left hand; must avoid concentrated exposure to extreme cold, vibrations, irritants such as fumes, odors, dust gases, poorly ventilated areas and hazards such as moving machinery and unprotected heights; can understand, remember and carry out detailed and simple instructions; can have only occasional changes in the work setting; and can occasionally interact with the public. (Tr. at 100-101) The VE testified that such an individual could perform Claimant's past work as a hospital cleaner as performed. (Tr. at 101) Additionally, the VE stated that the individual could perform other medium unskilled jobs including sorter, assembler, or store laborer. (Id.) When asked about work at the light level, the

VE testified that the individual could perform the following jobs: price marker, package labeler, and nut and bolt assembler. (Tr. at 102)

Claimant's attorney asked the VE if the individual could perform any work-related activities if limited to lifting and carrying occasionally less than ten pounds; lifting and carrying frequently less than ten pounds; standing and/or walking less than two hours in an eight hour day; sitting less than six hours in an eight hour day; pushing and pulling in the lower extremities is affected, including operation of hand controls; occasional climbing of ramps, stairs, ladders, ropes and scaffolds with the use of handrails for support; never balancing, kneeling, crouching, crawling or stooping; limited reaching in all directions, including overhead; limited handling and gross manipulation; occasional reaching; and occasional handling. (Tr. at 102-103) The VE responded that the individual could perform no work in the national economy. (Tr. at 103)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

## Analysis

### Determining Severe Impairment:

Claimant has argued that the ALJ erred at step two, specifically where the ALJ discounted Claimant's physical impairments as they related to her calcaneal spurs, anemia, and especially, the neurological issues involving her lower back and lower extremities. Claimant has stated that these errors were compounded when the ALJ impermissibly "excluded" the nerve conduction study which corroborated her lower extremity neuropathy and polyneuropathy, which in turn, lead to the improper devaluation of the opinion evidence provided by Mr. Guiden and Ms. Hughes, discussed *infra*. (ECF No. 14 at 12-15)

A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." See 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." Id. §§ 404.1522(b), 416.922(b). The Regulations provide examples of these activities:

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) capacities for seeing, hearing, and speaking;
> (3) understanding, carrying out, and remembering simple instructions;
> (4) use of judgment;
> (5) responding appropriately to supervision, co-workers and usual work situations; and
> (6) dealing with changes in a routine work setting.

Id. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality

which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

Additionally, Claimant had to prove that she had an impairment (or combination of impairments) that had more than a minimal effect on her ability to do basic work activities for a continuous period of no less than 12 months. 20 C.F.R. §§ 404.1505(a), 416.905(a); Social Security Ruling ("SSR") 96-3, 1996 WL 374181. The impairment must also not "be reasonably controlled by medication or treatment[.]" See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Claimant also bears the burden of establishing a disabling impairment. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (holding that the claimant bears the burden of proof and persuasion at steps one through four, stating "it is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so").

In this case, the ALJ acknowledged Claimant's claims of disability due to calcaneal spurs/feet conditions, anemia, and peripheral neuropathy, as well as numerous other ailments. (Tr. at 23-26) With respect to her feet-related impairments, the ALJ noted that the record indicated in August 2013, Claimant sought treatment for pain and swelling in her left ankle, and that despite x-rays failing to show a fracture, dislocation or degenerative changes (Tr. at 23, 825), they did reveal "a large calcaneal spur." (Id.) The ALJ further noted that in July 2014, Claimant's right heel x-rays showed "[c]alcaneal spurring at both the Achilles tendon insertion and the plantar fascia origin." (Tr. at 23, 814) The ALJ recognized that the record did not demonstrate that Claimant "sought or received any treatment for this condition over the past four years" and that "the evidence

of record fails to show that this condition results in significant functional limitations." (Tr. at 23) Accordingly, the ALJ deemed Claimant's calcaneal spurs "not a severe impairment." (Id.) With regard to other feet-related conditions, the ALJ noted Claimant's allegation that a "bad ligament in right foot" (in addition to neck pain) limited her from working (Tr. at 25, 386, 405), "[h]owever, there is no evidence of record documenting any treatment for these problems. Accordingly, the undersigned finds there are no medically determinable impairments associated with these allegations." (Tr. at 25)

The ALJ also considered Claimant's anemia, for which she was diagnosed in January 2015. (Tr. at 24, 734, 736) The ALJ discussed the medical evidence related to this impairment, including Claimant's treatment provided by Dr. Abdul Zanabli at Charleston Nephrology (Tr. at 24, 656-658), which included five iron infusions from February 2015 to March 2015. (Tr. at 24, 635, 651-654) The ALJ then noted at a June 2015 follow-up appointment that Claimant had been "doing alright" and then by October 2017, Dr. Zanabli reported that Claimant was "currently with no recent lab workup." (Tr. at 24, 926, 1129) The ALJ noted that "[t]he evidence of record does not establish significant limitation of work-related functioning secondary to anemia" and deemed this to be a non-severe impairment. (Tr. at 24)

The ALJ then proceeded to discuss Claimant's testimony as it related to peripheral neuropathy, acknowledging that she stated he left leg goes numb and that the evidence of record "indicates the claimant denied numbness on numerous occasions from January 2015 to March 2015." (Tr. at 24, 635, 639, 643, 647, 651, 656)[3] The ALJ then considered a May 2015 treatment note from Mr. Porter that indicated Claimant reported that her left leg goes numb and is very

[3] It is noted that these records concern the office treatment records from Charleston Nephrology where Claimant was treated for iron deficiency/anemia.

painful. (Tr. at 24, 726-728) It was noted that a neurological exam revealed normal cranial nerves, "[n]evertheless, [Mr. Porter] diagnosed the claimant with peripheral neuropathy and ordered a nerve conduction study of her left lower extremity." (Id.) In the June 9, 2015 treatment note, the nerve conduction study showed "moderate bilateral L5/S1 radiculopathy; left tibial neuropathy at the ankle; and moderate polyneuropathy." (Tr. at 24, 929-932) The ALJ noted "neither the treating physician nor the study technician were identified in this report. Furthermore, the study was not signed." (Tr. at 24) The ALJ then discussed Mr. Porter's June 30, 2015 treatment note, indicating that the nerve conduction study "showed sciatic involvement from lower back" (Tr. at 24, 919-922), prompting Mr. Porter to change Claimant's diagnosis from peripheral neuropathy to lumbago with sciatica. (Id.) The ALJ acknowledged that Mr. Porter noted the "abnormal nerve conduction study suggesting L4-L5 involvement an[d] sciatic pain into [the] left leg." (Id.) The ALJ then goes on to note that "[t]he evidence of record contains no other diagnosis of peripheral neuropathy. In addition, there is no indication that the claimant has received treatment for peripheral neuropathy. This is not a medically determinable impairment." (Tr. at 25)

After having determined that her calcaneal spurs/feet conditions and anemia were non-severe impairments, and that her peripheral neuropathy a non-medically determinable impairment, the ALJ acknowledged that Claimant's symptoms as related to her impairments would affect her ability to do work-related activities and provided his analysis thereof. (Tr. at 29-33)

First, the ALJ took note of Claimant's testimony from the administrative hearing in April 2017, wherein she testified about experiencing a "throbbing pain that goes down her left leg" and that she had back pain that was exacerbated by standing, sitting, and walking." (Tr. at 29) Additionally, the ALJ noted Claimant stated she took ibuprofen 800 mg, applied creams, used a

heating pad, and would lie down to alleviate her pain. (Id.) He noted her testimony that she was recommended to not walk without a walker. (Id.) From her more recent testimony in June 2018, the ALJ noted that Claimant testified that she has low back pain located about her beltline that radiates into her hips and down both legs, which she described as "stabbing, throbbing, and sickening pain that occurs every day." (Id.) With regard to her treatment methods, Claimant testified that she is prescribed gabapentin, which did "not fully take away the pain", and that she takes ibuprofen, which upsets her stomach. (Id.) The ALJ further noted that Claimant testified that she has had this back pain for about 18 years. (Id.) Finally, the ALJ noted that Claimant stated that she tried physical therapy, but this did not resolve her pain, and her physician was to start her on injections. (Id.)

With respect to Claimant's feet issues, the ALJ noted that Claimant had represented that she had daily swelling of both feet and for this condition she takes Lasix and has had water drained. (Tr. at 30) Claimant testified that Lasix helps control the swelling, but not completely and that she experiences a sharp pain in her feet when sitting and standing. (Id.)

The ALJ then discussed the medical record as it related to these conditions, which included evidence concerning back and leg problems: the December 2005 x-ray revealed degenerative changes in Claimant's dorsal spine (Tr. at 30, 558); the March 2014 back exam revealed full range of motion and no tenderness (Tr. at 30, 703-705); records showing Claimant's denial of back pain on numerous occasions from January 2015 to March 2015 (Tr. at 30, 630-662)[4]; a June 30, 2015 notation by Mr. Porter that "a 'nerve conduction [study] . . . showed sciatic involvement from [the] lower back' " (Tr. at 30, 919); the November 2015 exam provided by neurologist Dr. Dave that

---

[4] These pertain to the office treatment records from Charleston Nephrology.

was normal, but due to Claimant's complaints of increased pain, her dosage of Neurontin was increased (Tr. at 30, 1219-1226); the February 2016 diagnosis of lumbago with sciatica by Mr. Porter due to Claimant's left leg pain (Tr. at 30, 950-952); the March 2016 radiological study showing "mild disc desiccation and mild facet arthropathy at multiple levels" without "evidence of fracture, high-grade central canal narrowing, or herniated discs" (Tr. at 30, 959-960); the May 2016 back examination provided by neurologist Dr. Walker revealing limited and painful range of motion with flexion and extension, negative bilateral straight leg testing along with Dr. Walker's opinion that he "did 'not see any surgically remediable pathology" and "recommended 'conservative treatment with physical therapy' " (Tr. at 30, 1057-1060, 1196-1199); a July 2016 treatment note from Mr. Porter diagnosing Claimant with lower back pain with a referral to Dr. Marsh[5] (Tr. at 30, 1017-1019); a September 2016 treatment note from Mr. Porter referring Claimant to the "laser spine institute in [C]olumbus" without any further documentation that treatment was provided from a laser spine institute in Columbus (Tr. at 30, 1021-1024); the May 2017 x-rays indicating "stable" degenerative changes in Claimant's thoracic spine (Tr. at 31, 1139); and finally, the April 3, 2018 MRI of Claimant's lumbar spine showing mild degenerative changes as well as Tarlov cysts in the sacrum at S2-S3 (Tr. at 31, 1183-1184).

The ALJ also discussed the medical evidence concerning an upper gastrointestinal endoscopy that Claimant underwent on March 13, 2015 and that the procedure revealed "a small hiatal hernia, likely due to reflux." (Tr. at 31, 683)[6]

Finally, with respect to the RFC the ALJ fashioned from the evidence of record, the ALJ

---

[5] The record does not contain any medical records or treatment notes from Dr. Marsh.

[6] This medical record states that Claimant's preoperative diagnosis was "iron deficiency anemia" and further notes that "[t]his procedure is done to rule out a source for chronic gastrointestinal bleeding." (Tr. at 683)

noted that he included limitations to account for these physical impairments, noting that she "suffers from degenerative disc disease and sciatica, with objective findings of limited and painful range of motion, tenderness, normal to antalgic gait, and negative straight leg raise." (Tr. at 33)

When an adjudicator fails to list an additional impairment as severe at step two, it is not reversible error if the adjudicator finds at least one other severe impairment and continues with the remaining steps in the sequential evaluation process. Ashby v. Colvin, 2015 WL 1481625, at *9 (S.D.W. Va. Mar. 31, 2015). In this case, the ALJ specifically considered Claimant's symptoms as they related to not only her anemia and calcaneal spurs, but also specifically to her lower back pain with neuropathy and/or sciatica, and factored those limitations in the RFC assessment, which is compliant with the Regulations.

Accordingly, the undersigned **FINDS** that the ALJ's determination that Claimant's anemia, calcaneal spurs as non-severe impairments is supported by the substantial evidence and did not rise to reversible error. With respect to the ALJ's determination that Claimant's "peripheral neuropathy" is "not a medically determinable impairment" (Tr. at 24-25), the ALJ noted that this diagnosis was changed to "lumbago with sciatica" based on the nerve conduction study results, and further noted that "[t]he evidence of record contains no other diagnosis of peripheral neuropathy. In addition, there is no indication that the claimant has received treatment for peripheral neuropathy." (Id.) To the extent that Claimant argues that the ALJ "excluded" the results of the nerve conduction study (ECF No. 14 at 11-15), the undersigned **FINDS** that this argument lacks merit: the ALJ's recitation of the medical evidence of record, *supra*, demonstrates that the ALJ did not "exclude" this evidence, because it is clear that he considered this evidence, noting the results, including the change in Claimant's diagnosis, and significantly, the ALJ considered Claimant's symptoms as they related

to her neurological impairment. Therefore, the undersigned further **FINDS** that the ALJ's determination that "peripheral neuropathy" was not a medically determinable impairment is based upon substantial evidence because there was no objective medical evidence derived from medical or clinical findings or signs established by medically acceptable clinical diagnostic techniques that supported such a diagnosis.[7] In addition, the undersigned **FINDS** that the ALJ's failure to include "lumbago with sciatica" as a severe impairment at step two is not reversible error because the ALJ explicitly considered Claimant's symptoms and limitations therefrom at the subsequent steps in the sequential evaluation process.

Evaluation of Opinion Evidence:

Because Claimant takes issue with the ALJ's evaluation of the opinion evidence provided by Mr. Guiden and Ms. Hughes, as a practical matter it is best to review how the SSA governs the criteria for evaluating opinion evidence prior to addressing the ALJ's RFC assessment and fifth step determination; per §§ 404.1527(a)(1), 416.927(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

---

[7] See, e.g., *Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 2016 WL 1119029, at *3:

> An individual's symptoms, such as pain, fatigue, shortness of breath, weakness, nervousness, or periods of poor concentration will not be found to affect the ability to perform work-related activities . . . unless medical signs or laboratory findings show a medically determinable impairment is present. Signs are anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques that can be observed apart from an individual's symptoms. Laboratory findings are anatomical, physiological, or psychological phenomena, which can be shown by the use of medically acceptable laboratory diagnostic techniques. *We call the medical evidence that provides signs or laboratory findings objective medical evidence.* We must have objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce an individual's alleged symptoms. (*emphasis* added)

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.

Of interest here, the ALJ considered the March 2017 opinion evidence, detailed *supra*, provided by Mr. Guiden and Ms. Hughes, who the ALJ noted were a physical therapist and an exercise physiologist, respectively. (Tr. at 33, 1121-1125) After a recitation of the Regulations as they pertain to the evaluation of opinion evidence, as an initial matter, the ALJ determined that there was "no basis for giving this opinion controlling weight." (Tr. at 33-34) Because Claimant filed her claims prior to March 27, 2017, the Regulations directed that treating physician assessments were to be given "controlling weight", and when not given controlling weight, the adjudicator is to provide "good reasons" for the weight given to a treating source opinion. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ proceeded to explain that the opinion "is not 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and are [*sic*] inconsistent 'with the other substantial evidence in [the] case record.' " (Tr. at 34)

Starting with the first factor, the ALJ observed that Mr. Guiden and Ms. Hughes "failed to indicate how often they treated the claimant" and noted that "the evidence of record does not contain any treatment notes completed by these individuals." (Id.) Thus, the ALJ "is unable to determine the length or frequency of the treatment relationship." (Id.) Next, in consideration of the second factor, the ALJ found there is no objective evidence of any treatment relationship between Claimant and Mr. Guiden and Ms. Hughes, and was unable to determine the nature and extent of

the treatment relationship, but noted "it is probable that the claimant visited these individuals for physical therapy and/or a functional capacity evaluation." (Id.) With respect to the third factor, the ALJ acknowledged that Mr. Guiden and Ms. Hughes "cited the following findings to support their opinion: lack of endurance, shortness of breath, pain, limited range of motion, and 'difficulty walking' ", but they "failed to identify any medical condition responsible for these findings." (Id.)

With regard to the fourth factor, the ALJ determined that "the limitations in the opinion was inconsistent with the objective evidence of record" and proceeded to specify:

> They opined that the claimant could stand/walk a total of two hours; can sit a total of two hours; and can lift a maximum of 10 pounds. Even though x-rays of the claimant's lumbar spine revealed "mild" degenerative disc disease, there was no evidence of spinal fracture, herniation, or stenosis. The claimant is morbidly obese, but there is nothing to suggest her obesity would justify such excessive exertional limitations. Furthermore, the claimant does not have other medical impairments (such as cardiovascular impairment) that would justify these restrictions. Finally, Mr. Guiden and Ms. Hughes opined that the claimant could never balance. However, the overall evidence of record fails to document a complete inability to balance. Likewise, there is no indication that the claimant requires a handheld assistive device to ambulate.

(Id.) Next, the ALJ considered their opinion under the fifth factor, noting that neither Mr. Guiden nor Ms. Hughes were medical doctors specializing in neurology, orthopedics, or internal medicine, and determined therefore their opinion was entitled to less weight than if they had been doctors specializing in those fields. (Tr. at 34-35) Finally, the ALJ addressed the opinion against the sixth factor, and observed that the evidence did not indicate either Mr. Guiden or Ms. Hughes were familiar with the Social Security disability program and their evidentiary requirements, and further noted that "there is no indication that they were familiar with the medical evidence of record when they issued their opinion." (Tr. at 35) Accordingly, the ALJ assigned their opinion little weight. (Id.)

Although Claimant disagrees with the ALJ's assessment of the opinion provided by Mr. Guiden and Ms. Hughes, the Court does "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (*per curiam*) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). What Claimant invites this Court to do is essentially re-weigh this evidence and make a finding that substitutes the judgment of the ALJ which is explicitly prohibited. In this case, the ALJ cited to the evidence that supported his evaluation of this medical opinion. The Fourth Circuit discussed in *dicta* the adequacy of an ALJ's evaluation of medical opinion evidence in Monroe v. Colvin, 826 F.3d 176, 190-191 (June 16, 2016). The Court determined that an ALJ needs to specify what evidence conflicts with a consultative examiner's findings – basically, a conclusory blanket rejection of an opinion will not be sufficient. This Court has recognized that "it is good practice" for an ALJ to provide "good reasons" for the weights assigned to examining sources "so that a reviewing court can properly perform its role." Starcher v. Colvin, No. 1:12-1444, 2013 WL 5504494, at *6 (S.D.W.Va. Oct. 2, 2013). It is interesting that the ALJ employed the "treating physician rule" for his evaluation of the opinion evidence provided by Mr. Guiden and Ms. Hughes, given that neither are deemed "acceptable medical sources" under the Regulations[8], however, it is significant insofar as the ALJ provided numerous "good reasons" for discounting their opinion, thereby allowing this Court to engage in an appropriate judicial review for the ALJ's determination of same.

---

[8] 20 C.F.R. §§ 404.1502(a), 416.902(a) provide that an "acceptable medical source" includes the following: licensed physician; licensed psychologist; licensed optometrist; licensed podiatrist; qualified speech-language pathologist; licensed audiologist; and for claims filed after March 17, 2017, licensed advanced practice registered nurse and licensed physician assistant.

Accordingly, the undersigned **FINDS** the ALJ's evaluation of the opinion evidence provided by Mr. Guiden and Ms. Hughes is supported by the substantial evidence.

The RFC Assessment and Step Five of the Sequential Evaluation Process:

Finally, Claimant has argued that the ALJ's handling of the evidence as it related to Claimant's physical impairments, namely her calcaneal spurs, chronic anemia, and neuropathies as demonstrated by the nerve conduction study and numerous medical records, as well as the West Virginia Title 19 Medicaid Waiver Program permitted the ALJ to make an RFC determination that did not fairly assess or consider Claimant's limitations. (ECF No. 14 at 17-18, 19-21)

It is known that the RFC assessment is an issue reserved to the Commissioner, notwithstanding any medical source opinions concerning the RFC assessment. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Under this premise, the ALJ made the following pronouncement with respect to Claimant's limitations as they related to all of her physical impairments:

> As discussed above, the claimant suffers from degenerative disc disease and sciatica, with objective findings of limited and painful range of motion, tenderness, normal to antalgic gait, and negative straight leg raise (Exhibits 2F, 4F, 5F, 11F, 18F, 26F-28F, and 31F).[9] In addition, she underwent a ventral hernia repair in April 2016 and left carpal tunnel release in March 2014. Finally, Ms. Allen is morbidly obese (Exhibits 2F, 4F-6F, 11F, 12F, 13F, 24F, and 33F).[10] Accordingly, the undersigned finds she is limited to medium work: can occasionally climb ladders, ropes, or scaffolds; can frequently climb ramps and stairs; can frequently balance,

---

[9] The transcript provides that these Exhibits refer to the medical records provided by: Thomas Memorial Hospital dated June 10, 2003 through December 12, 2013 (Tr. at 509-617); Charleston Nephrology dated January 29, 2015 through March 24, 2015 (Tr. at 630-662); Saint Francis Hospital dated March 11, 2014 through April 30, 2015 (Tr. at 663-720); Spring Hill Primary Care Physicians, PLLC dated October 23, 2015 through February 25, 2016, June 2, 2016 through November 15, 2016, February 26, 2018 through April 6, 2018 (Tr. at 941-957, 1017-1065, 1179-1194); Neurological Associates dated May 24, 2016 through June 2, 2016; Thomas Memorial Hospital dated March 21, 2016 through April 3, 2018; and Neurology & Headache Clinic dated November 10, 2015, respectively.

[10] The transcript provides that Exhibits 6F, 12F, 13F, 24F, and 33F refer to medical records provided by: Spring Hill Primary Care Physicians, PLLC dated August 9, 2012 to May 14, 2015 (Tr. at 721-878); a radiology report from Thomas Memorial Hospital dated March 21, 2016 (Tr. at 958-960); outpatient records from Saint Francis Hospital dated April 5, 2016 (Tr. at 961-975); Spring Hill Primary Care Physicians, PLLC dated May 15, 2017 to January 22, 2018 (Tr. at 1139-1171); and office treatment records from Steve M. Zekan, M.D. dated October 1, 2015 to May 7, 2018 (Tr. at 1310-1362), respectively.

stoop, kneel, crouch, and crawl; and must avoid concentrated exposure to extreme cold, vibrations, and hazards such as moving machinery and unprotected heights.

Ms. Allen has had episodes of bronchitis on several occasions (Exhibit 6F). In addition, she as been diagnosed with interstitial lung disease. Therefore, the undersigned finds the claimant must avoid concentrated exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas. Ms. Allen underwent left carpal tunnel release in March 2014 (Exhibit 5F/41-43). Thus, the undersigned has limited her to frequent handling, fingering, and feeling with the dominant left hand.

A claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. <u>See</u> SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a).

In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

As noted *supra*, the controlling RFC was posed as a hypothetical to the vocational expert. The vocational expert initially characterized that Claimant's past relevant work as a veterinarian assistant as medium, semi-skilled, but heavy as performed; Claimant's past relevant work as a hospital cleaner was characterized as medium, unskilled, and medium as performed. (Tr. at 100) Having been given the controlling RFC with respect to Claimant's physical limitations, *supra*, as a hypothetical, the vocational expert opined that Claimant could do other medium and light jobs in the national economy. (Tr. at 100-102) The vocational expert also testified that pursuant to the

controlling RFC, Claimant could perform her past relevant work as a hospital cleaner. (Tr. at 101)

It is well known that in order for a vocational expert's opinion to be relevant or helpful, it must be based on all other evidence in the record and responsive to a proper hypothetical question that fairly sets out all of a claimant's impairments. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (internal citations omitted). It is also well known that a hypothetical question is "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." Fisher v. Barnhart, 181 Fed. App'x 359, 364 (4th Cir. 2006) (citing Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005). In this case, Claimant testified that she quit her job as a veterinary assistant because she could not lift the dogs, which were "50 pounds and over", and that she had back pain that would go into her hips as well as her legs. (Tr. at 84, 86) Claimant also testified that she qualified for the West Virginia Age and Disability Waiver Program that provided a State nurse to come to her house to fix Claimant's meals, clean Claimant's house, assist Claimant with showering, and taking Claimant to her doctor's appointments and that Claimant receives five and half hours of this assistance a day. (Tr. at 89-90) Claimant also testified that she had two hernia surgeries. (Tr. at 90) Indeed, the ALJ acknowledged Claimant's testimony that she underwent two hernia surgeries and because of the hernia, she was not able to lift over ten pounds. (Tr. at 29) The ALJ also acknowledged that Claimant receives assistance from a home health nurse at her home "five days a week for five and a half hours a day." (Id.) Earlier in the decision, the ALJ found that Claimant had a "mild" limitation in adapting or managing oneself, although he noted she testified that she needed assistance performing activities of daily living due to her physical problems. (Tr. at 28) Later on the decision, the ALJ discussed the medical evidence of record which included a treatment note dated March 19, 2014 wherein Claimant complained of a "large right inguinal

hernia [that] is very painful" (Tr. at 31, 703-705) The ALJ noted that a March 13, 2015 upper gastrointestinal endoscopy revealed "a small hiatal hernia" and an April 30, 2015 CT scan revealed "two ventral hernias . . . herniation of fat." (Tr. at 31, 683, 667-668) The ALJ noted that the medical records showed that in April 2016, Claimant underwent a ventral hernia repair (Tr. at 31, 963-966), and that by May 2016, Claimant was reportedly "doing well postop." (Tr. at 31, 1323) Incidentally, the record contains a treatment note dated June 2, 2016 from Dr. Walker who determined that due to Claimant's hernia repair, "we would recommend that she wait the appropriate length of time before starting her physical therapy." (Tr. at 1059, 1198) Finally, the ALJ noted another treatment note dated March 19, 2018 indicated that Claimant's abdominal exam revealed "some mild diffuse tenderness" although "no hernia could be appreciated." (Tr. at 31, 1311)

It is significant that in June 2016, Claimant was deemed eligible to receive in-home services from a nurse through the West Virginia Aged and Disabled Waiver Program, a State agency "to help Medicaid-eligible individuals to remain in their homes" (Tr. at 976), that earlier in May 2016 she underwent hernia surgery that caused her medical providers to delay her physical therapy for her back issues, in addition to the fact that in corroboration with Claimant's own testimony, two medical providers, albeit non-acceptable sources, opined that Claimant is limited to lifting/carrying less than 10 pounds. With the record replete with ongoing treatment for Claimant's back coupled with this evidence, the Court is left to wonder how the ALJ concluded Claimant could perform "medium work" because there is no explanation as to how Claimant could actually perform the tasks required by "medium work", which includes lifting up to 50 pounds at

a time, frequently lifting or carrying up to 25 pounds. See SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983); see also, Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018).

Without the ALJ's explanation as to how he concluded Claimant could perform medium work where no other medical provider or evidence is referenced that supports this finding, the RFC assessment as it stands does not contain the narrative that "build[s] an accurate and logical bridge from [that] evidence to his conclusion." Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016). In short, the undersigned **FINDS** that the RFC assessment that provides that Claimant is capable of performing medium work is not supported by substantial evidence. Additionally, because the hypothetical question posed to the vocational expert therefore does not "fairly" accommodate Claimant's impairments, specifically with respect to the limitation to "medium work", the undersigned further **FINDS** that the fourth and fifth step findings of the sequential evaluation are not supported by substantial evidence. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).

Although Claimant contends that the errors below are cause for a reversal of the final decision and for entry of an order entitling her to benefits, it is clear from the rest of the ALJ's analysis and the evidence of record that there is conflicting evidence that is for the ALJ to reconcile in order for a reviewing court to engage in substantial evidence review. See Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984); Hines v. Bowen, 872 F.2d 56, 59 (4th Cir. 1989). Because this Court has no way of evaluating the basis of the ALJ's decision, particularly with respect to the RFC assessment, the "proper course, except in *rare* circumstances, is to remand to the agency for additional investigation or explanation." See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (*emphasis* added) Further, because the weighing of conflicting evidence is within the province of the Commissioner, remand for further proceedings

before the agency is the proper course of action in this case, regardless of the fact that this case "has been pending for some time." See, e.g., <u>Radford v. Colvin</u>, 734 F.3d 288, 295 (4th Cir. 2013).[11]

In sum, the undersigned **FINDS** that the Commissioner's final decision that Claimant was not disabled is not based on substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for judgment on the pleadings to the extent that the final decision be reversed (ECF No. 14), **DENY** the Defendant's request to affirm the decision below (ECF No. 17), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order for the ALJ to properly consider and evaluate the evidence of record that supports an appropriate RFC assessment.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is

---

[11] While the undersigned is mindful that this matter has once before been remanded by the Appeals Council, that is not enough for this Court to go against long-standing jurisprudence regarding the propriety of remanding for review versus remanding for benefits.

made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: August 26, 2019.


Omar J. Aboulhosn
United States Magistrate Judge